NOTICE
Decision filed 10/01/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220703-U

NO. 5-22-0703

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 16-CF-4 |
| | ) | |
| ADRIANE L. PARKE, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Cates and Sholar concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court erred by denying defendant's motion to suppress, where defendant was in custody during questioning at the fire department, requiring *Miranda* warnings. The trial court abused its discretion by denying defendant's motions to substitute and continue her trial, where the evidence does not support a finding that defendant's actions constituted delay or thwarted justice.

¶ 2     Defendant, Adriane L. Parke, appeals the Jefferson County circuit court's October 17, 2022, order denying defendant's motion for a new trial, wherein defendant alleged that the court erred by denying defendant's motions to suppress statements and substitute attorney. She argues that the court (1) committed reversible error by denying her motion to suppress her un-Mirandized responses to a custodial interrogation, (2) violated her sixth amendment right to counsel by denying her motion to substitute attorneys, and (3) imposed an excessive sentence. For the following reasons, we reverse and remand.

1

¶ 3                                    I. Background

¶ 4     On January 11, 2016, the State charged defendant by information with three counts: (1) aggravated arson (720 ILCS 5/20-1.1(a)(1) (West 2012)), a Class X felony, alleging that defendant, on December 2, 2015,[1] knowingly partially damaged the Drury Inn in Mt. Vernon, Illinois, when she knew or reasonably should have known that one or more persons were present therein; (2) arson (*id.* § 20-1(a)(1)), a Class 2 felony, in that defendant knowingly, without consent of the Drury Inn, partially damaged the Drury Inn by means of fire; and (3) criminal damage to property (*id.* § 21-1(a)(1)), a Class 4 felony, in that defendant knowingly committed partial damage to the Drury Inn in excess of $300 but not in excess of $10,000. A grand jury subsequently returned a bill of indictment charging defendant with the same.

¶ 5     On June 7, 2017, while defendant remained out of custody on bond, defendant's attorney, Attorney Bryan Drew, filed a motion for fitness examination. Attorney Drew alleged a *bona fide* doubt as to defendant's fitness to stand trial, requesting that the trial court order a mental psychiatric examination of defendant, which the court subsequently granted.

¶ 6     On December 1, 2017, Dr. Angeline Stanislaus, a board-certified psychiatrist in general and forensic psychiatry, determined defendant fit to stand trial. Dr. Stanislaus's report indicated that she evaluated defendant on September 7, 2017, at which time Dr. Stanislaus diagnosed defendant with borderline intellectual functioning. Despite this, Dr. Stanislaus believed defendant had a good understanding of the charges and the nature of the proceedings against her, as well as the ability to rationally communicate with her attorney and assist him in her defense. The report also indicated that defendant's "younger sister helps her with things if she cannot understand

---

[1]The State's original information incorrectly stated that the alleged criminal offenses took place on December 2, 2016. On January 22, 2016, the State filed a bill of indictment amending the date of the offenses as December 2, 2015.

2

something." The trial court, relying on Dr. Stanislaus's opinion and report, subsequently found defendant fit to stand trial.

¶ 7    On January 2, 2018, defendant filed a motion to suppress. Defendant requested that the trial court bar the State from adducing any and all statements made by defendant to Detective Nathan Franklin of the Mt. Vernon Police Department and Fire Investigator Shane Emrich of the Mt. Vernon Fire Department during a custodial interrogation on December 23, 2015, at the Mt. Vernon Fire Department. Specifically, defendant claimed that Emrich engaged in a custodial interrogation with Franklin, a police officer, without advising defendant of her *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). Defendant also claimed that Emrich and Franklin controlled the questioning concerning defendant's criminal involvement as a suspect in the fire on December 2, 2015, asserting that "[n]o reasonable person would have believed that they were in anything other than a custodial interrogation."

¶ 8    On May 24, 2018, the trial court held a hearing on defendant's motion to suppress. The State called Emrich to testify first.

¶ 9    Emrich testified that on or about December 15, 2015, a security officer at the Drury Inn informed him that defendant, a housekeeper at the hotel, may have been involved in starting the December 2, 2015, fire. Emrich also received an internal investigation report from the Drury Inn on December 15, 2015. As such, Emrich believed defendant may be a suspect. Sometime between December 15 and December 19, 2015, Emrich contacted defendant via phone to set up an interview. On the phone, Emrich and defendant scheduled the interview for December 23, 2015, agreeing that "the fire station would be [a] convenient" place to meet. Defendant asked if her husband, Jeremy Parke, could be present during the interview. Emrich, who knew Jeremy from

3

work, agreed to defendant's request. Emrich confirmed that he provided defendant with the choice of when and where to meet.

¶ 10 On December 23, 2015, defendant and her husband, driving their own personal vehicle, arrived at the Mt. Vernon Fire Department. Emrich greeted defendant and Jeremy in the living quarters, at which time Emrich offered Jeremy "a seat with the other firemen that were present in the lounge area." Emrich testified that he and Franklin walked upstairs with defendant to an office adjacent to the sleeping quarters. While walking upstairs, Emrich told defendant that he planned to conduct an "information gathering interview" with her in an effort to conclude his investigations for the year. Emrich confirmed that he told defendant that "she was going to go home today."

¶ 11 During the interview, Emrich sat at the end of the desk, while Franklin sat behind the desk. Emrich wore his uniform and Franklin wore a dress shirt, tie, and slacks and carried a weapon on his person. Defendant sat in front of the two men, between two doorways. Neither Emrich nor Franklin sat between defendant and the two doors. Emrich interviewed defendant for approximately 51 minutes, describing the interview as "pleasant" and defendant as "receptive." Emrich testified that he spoke to defendant for the first 25 minutes of the interview, while Franklin remained quiet. Emrich testified that neither he nor Franklin physically restrained defendant, arrested her, or showed her a weapon in a show of force. Defendant never asked to have her attorney present.

¶ 12 On cross-examination, Emrich testified that the internal investigation report from the Drury Inn accused defendant of starting the fire. The report included inconsistences between defendant's statements and the opinions of the Drury Inn's internal investigator as to how the fire started. Emrich clarified that Franklin wore his uniform in the interview, which included a dress shirt, a tie, and slacks. Emrich admitted that he did not invite Jeremy to the office when defendant and

4

Jeremy arrived at the fire department. Emrich confirmed that he had knowledge that defendant was a suspect prior to the December 23, 2015, interview. Emrich also testified that he contacted Franklin to assist him because Franklin was "a good interviewer." Emrich admitted that neither he nor Franklin suggested that defendant have her attorney present, and that they both challenged the truth of defendant's statements during the interview. The following colloquy took place between Attorney Drew and Emrich:

"Q. If your goal was simply to get information and get her story, why would you challenge her statements you believed to be false?

A. I was gaining information.

Q. And you had a police officer present, correct?

A. He was there, yes.

Q. And your goal was to gain information for that police officer in this investigation of a potential arson, correct?

A. My goal is to gain the truth."

¶ 13    On redirect examination, Emrich clarified that neither defendant nor Jeremy requested Jeremy's presence in the interview when they arrived at the fire department on December 23, 2015. Emrich confirmed that he knew defendant's husband—a paramedic for the private ambulance service in Mt. Vernon—and had a work-related relationship with him. Emrich stated that he "believed [defendant] knew who [he] was and where she was at" during the interview. Emrich testified that he did not observe any mental deficiencies on defendant's part.

¶ 14    On recross-examination, Emrich confirmed that, although he did not deny Jeremy access to the interview, he offered him a seat in the lounge area. The following colloquy took place between Attorney Drew and Emrich:

"Q. And do you remember [Detective Franklin] saying I explained to her that I had done several interviews, and I have learned to pick up on things when people are lying?

A. Uh-huh.

Q. Did you hear that?

A. Yes.

* * *

Q. You don't believe that was challenging her or accusing her of not telling the truth?

A. She wasn't telling the truth.

Q. Were you there when he also said to her[,] I told her if Investigator Emrich is telling us the fire wasn't started by the candle, that I believe him?

A. I was there.

Q. And that he told [defendant] that it was much more difficult to carry on a story of lies than it is to tell the truth. Were you there then as well?

A. I was.

Q. And did you also—were you also there at that point in time when [defendant] said that she was scared?

A. Yes.

Q. But you don't believe that [defendant] was being interrogated or challenged with her answers. You were just simply trying to get the truth.

A. She stated she was scared at the time of the fire, not at the time of the interview.

Q. Well, in the report, Mr. Franklin, he says that she said she was scared and felt like a failure. She didn't feel like a failure back that day. She's referring to that very

6

moment [during the interview], correct?

A. I don't know."

Following Emrich's testimony, the trial court went off the record to watch the 51-minute interview from December 23, 2015.

¶ 15 The recorded interview demonstrated the following. Defendant sat down at a desk, and Franklin fixed the camera before he sat down. Emrich first provided defendant a bottle of water, informed her of the two exits in the room, and then stated that he planned to record the interview. Defendant then provided her version of the events that took place at the Drury Inn on December 2, 2015. Defendant initially entered room 603 to straighten up the room. Once inside, defendant accidentally knocked over a candle. Defendant did not see any flames or a fire at that time, so she left to clean "other rooms." After "something didn't feel right," she decided to go back into room 603 to check the candle. When she entered room 603, she saw a fire, which prompted her to call 9-1-1 in room 601.

¶ 16 Emrich then asked defendant to clarify the specific housekeeping duties she performed the first time she entered room 603. Defendant stated that she restocked the towels and made the bed, clarifying that she only "clean[ed] up the pillow part" of the bed. She then left room 603. Defendant clarified that she accidentally knocked over the candle on the coffee table while tucking in the pillows. At that time, she noticed that the candle "tipped over," causing wax to spill "all over." She stated, again, that she did not see any flames or a fire, so she left the candle knocked over. She left to "clean another room" before she returned to room 603. When she reentered room 603, defendant saw a fire, prompting her to call 9-1-1 and her supervisor. Following instruction from her supervisor, defendant went downstairs. Defendant stated that she did not go back into room 603. Defendant indicated that the fire on the coffee table was near the lamp. She did not try to put

7

out the fire because the fire "looked too big," which scared her. Defendant confirmed that she worked as a first responder at the time of the interview.

¶ 17　In responding to defendant's version of the events, Emrich stated that her "facts [didn't] really line up," indicating his belief that she was not "completely forthright with [him]." Emrich asked defendant "to be honest." In response, defendant stated that the candle "was already lit" when she walked into room 603, however, when she tipped over the candle, she thought the wax "would put [the fire] out." When she left room 603 the first time, she did not see any fire or smoke. Emrich asked defendant if she wanted to change any version of her story. Defendant responded that she called 9-1-1 and a fellow housekeeper, who was also a firefighter, after she saw the fire in room 603. Defendant, again, stated that the candle was lit the first time she walked into room 603. She reiterated that she did not see any flames or a fire when she left room 603 the first time. Emrich responded: "I know you are not telling the whole truth." Defendant, again, denied that she lit the candle. Defendant then stated that she went into room 603 on three, not two, occasions. She stated that after she called 9-1-1, she went back into the room to "see the fire." She called a fellow housekeeper at that time. Emrich asked defendant to tell her story again.

¶ 18　Defendant stated that after she saw the fire in room 603, she called 9-1-1 but could not reach dispatch. She then went back to room 603 to check on the fire before she called 9-1-1 from room 604. She, again, did not reach dispatch, so she called the front desk and her supervisor. She then went into room 603 before she walked downstairs. Defendant then stated that she went into room 600 and "just stayed there" to "see if [she] could do whatever to help." At some point, defendant walked downstairs to help people exit from the front of the building. In response, Emrich stated, "to be a hero," to which defendant stated, "yes." Emrich stated: "You're still not telling me the truth." Defendant responded, "that's all that happened."

8

¶ 19 Defendant then responded that she became scared, so she went into rooms 600 and 601. Emrich asked why, if she was scared, she went into rooms near the fire. Defendant stated that she wished to help. She was scared of the fire, so she did not put the fire out. Defendant also noted that she never put out a fire, indicating that she had only held the water hose while working for the fire department. When she heard her supervisor, who had breathing issues, walk up the stairs, defendant's "first responder" instinct kicked in. Emrich informed defendant that her story, specifically, that she did not put out the fire when she first saw it in room 603, did not make sense to him. Defendant responded that she thought the wax would put the fire out when the candle tipped over. Defendant stated that she did not know how to use a fire extinguisher.

¶ 20 Emrich then informed defendant that "the candle did not start the fire." Defendant, again, stated that the candle tipped over, and she denied that she lit anything on fire. Emrich responded that the candle could not have started the fire because the candle was not tipped over. Emrich stated that he understood if defendant wanted to "save the day" by finding the fire and helping people. Emrich then stated: "I already know everything." While leaning forward in his chair towards defendant, Emrich stated: "Tell me what really happened." Emrich encouraged defendant to tell the truth, stating: "You tell me the truth, get it off your chest, and you walk out of here today, you go home, you can enjoy the holidays with your family. *** Just tell me what happened."

¶ 21 Approximately 19 minutes into the interview, defendant stated that the candle flame went out after she knocked over a candle in room 603 while cleaning. She decided to relight the candle with "a small piece of paper" that "caught real [*sic*] fast." She relayed that she was unable to stop the fire from burning everything around the candle on the table. Emrich responded: "I can tell you're telling me a portion of it. *** I've been doing this for a long time. I know how things burn and what can burn." Defendant responded, again, that she lit paper on fire. Emrich stated: "There

9

is more to this [story]." Defendant clarified that it was "cardboard paper." Emrich then referenced that defendant must be scared "right now." Emrich encouraged defendant to tell the truth, stating "we are not arresting you today, you're going home."

¶ 22 Defendant responded that she did not have a lighter but used paper to restart the candle. Emrich told her that a piece of paper would not catch a table or wall on fire. He then stated to defendant: "You put something between the candle and the wall ***, didn't you?" Defendant denied lighting the wall on fire, informing Emrich, again, that she lit the candle on the table with a piece of paper. Emrich stated, "that's not the truth, just tell me the truth." Defendant responded that she already told Emrich the truth. Again, Emrich requested defendant tell the truth from the beginning. Defendant stated the same story as indicated above.

¶ 23 Approximately 25 minutes into the interview, Franklin spoke up, stating that he heard "major inconsistencies" with defendant's story. Franklin informed defendant that he was trained to listen to people talk, stating to defendant: "You are clearly not telling us the truth." Franklin informed defendant that "she has left out a lot" from her story. Franklin encouraged defendant to tell the truth, acknowledging that it might have frightened her to hear he was a police officer. Defendant slightly nodded her head. Franklin also told defendant that she would go home for the holidays. Defendant started to cry, stating, "I'm scared, I feel like a failure." Defendant stated, "I don't want my daughter to come visit me in prison." Franklin encouraged defendant to state the truth and not worry about the consequences.

¶ 24 Defendant, while crying, stated that she tried to relight the candle with "heavy cardboard paper," but the paper fell behind the nightstand and caught the wall on fire. Defendant stated she did not have a lighter. She then stated that she had a washcloth on the table that fell back by the wall. Emrich stated two times that he did not believe her story. Emrich informed defendant that a

10

piece of paper could not light a wall on fire. Emrich encouraged defendant to tell the truth, which would make her feel better and allow her to go home and enjoy the holidays with her family.

¶ 25    Emrich acknowledged that defendant felt scared before he stated: "Tell me what really happened." Defendant responded, while tearful and pulling on her jeans, that she lit the candle and dropped "something," but she denied that she started the wall on fire. Emrich responded, "that's not what happened." Franklin stated that he understood defendant was scared. Franklin stated, however, that "the writing is on the wall," and he and Emrich knew that she "intentionally" lit something that started the fire. Franklin, looking and pointing at Emrich, stated to defendant, "I don't think there's any doubt between us that that's not the case." Franklin also stated that he felt, based on defendant's facial expressions, that she really wanted to tell the truth but was scared to be honest. Franklin then stated that God was the only person who could judge her and that "[g]etting [the truth] off your chest is the key to getting past it."

¶ 26    Defendant stated that she dropped the washcloth on the lit candle and the washcloth fell behind the nightstand while cleaning room 603. She then left room 603. Defendant "didn't feel right," so returned to room 603 and saw the wall on fire. Defendant clarified that the washcloth fell on top of the candle. Emrich asked if she left the washcloth on the candle. Defendant responded in the affirmative, stating that the fire "was already too big," and she was scared.

¶ 27    Franklin then asked defendant if she had a motive to start the fire. Franklin asked defendant whether she had issues at work or wanted to be celebrated by her employer for reporting the fire. Defendant stated that she wanted her employer to recognize her as a hero. Defendant stated, again, that the washcloth fell off the candle and behind the nightstand. She then left room 603 to call 9-1-1. Defendant reentered room 603, saw the fire, and then retreated to a nearby room to call 9-1-1. She, however, never received a response from dispatch, so she called the front desk and her

11

supervisor. Defendant then went to room 600 to "see if [she] could help because [she] felt bad for what [she] did."

¶ 28   Defendant stated, again, that the candle was "already burning" when she entered room 603 the first time. She stated that she tried to put out the fire with the washcloth, but the washcloth "caught the whole thing on fire." Defendant agreed with Franklin that she noticed the candle in room 603 before she went to another room to clean. While cleaning another room, she decided to go back into room 603 and throw a washcloth on the candle, giving her an opportunity to be a hero and "to shine." She left room 603. Upon returning to room 603, she noticed a big fire. Emrich responded, "that makes sense." Defendant said that the washcloth caught on fire, and the fire got too big for her to put out. Defendant admitted that she lit the fire, so she could put out the fire herself. Defendant denied that she had prior thoughts about starting a fire to gain recognition and praise. Defendant stated:

> "There's all—you know [people who] do drugs, this that at work, well, and the assistant, and I was like, well I want what her spot is. I wanna [*sic*] be[,] I'm a good person. *** I deserve *** like, maybe they'll recognize me now and—it didn't happen that way. I learned."

After the court viewed the footage of the video recording, the State rested.

¶ 29   Next, Attorney Drew called defendant to testify on her own behalf. Defendant, a housekeeper at the Drury Inn, also worked as a first responder with the Mt. Vernon Fire Department at the time of the incident. As a first responder, defendant assessed medical conditions by taking blood pressure, performing CPR, and assessing medical situations. Defendant testified she asked Emrich to have her husband with her during the interview, stating: "I can't talk—I don't understand a lot of things and he helps me." Defendant testified that she dropped out of high school

12

and did not have her general education development (GED). Defendant suffered physical and sexual abuse from the ages of 5 to 14 years old. As a result of this abuse, defendant testified that "once [people] start talking to me, I get confused and say whatever they want to hear to get them off my back or whatever." Defendant testified that she took three medications for depression at the time of the interview in 2015.

¶ 30    Specific to the interview, defendant testified that Emrich met her and Jeremy when they arrived at the fire department. Emrich "told [Jeremy] to sit down," and defendant walked upstairs with Emrich, where she saw Franklin for the first time "sitting out behind his desk *** with his legs propped up on the desk." Franklin did not introduce himself to defendant. Instead, Emrich "told [her] that [Franklin] was there for him, to help him with whatever." Defendant testified that she did not feel she could leave once Emrich started to question her. Neither Franklin nor Emrich Mirandized defendant.

¶ 31    On cross-examination, defendant admitted that she did not inform Emrich or Franklin of her prior physical or sexual abuse during the interview. She clarified that neither of them asked her. Defendant did not tell Emrich or Franklin that she felt scared to be in the room with both men. Although defendant knew Emrich, she testified, "I just went along with them to get them off my back." Defendant testified that she spent time in a psychiatric ward at the age of 15. She, however, did not tell Emrich and Franklin about her psychic admission or that she felt mentally depressed during the interview. Defendant admitted that she did not ask Emrich on December 23, 2015, if Jeremy could come upstairs to the interview room with her.

¶ 32    Following defendant's testimony, the trial court denied defendant's motion to suppress. In ruling that Emrich and Franklin did not conduct a custodial interrogation, the court stated that it

did not believe defendant's lack of a high school education had "any bearing on a person's intelligence or ability to understand things." The court proceeded to state:

"I would point out that my father didn't even finish eighth grade, and he was one of the smartest people I ever knew. That was a different time. Also, [defendant] is able to be a first responder. *** [S]he does have the ability, the intellectual ability to assess medical situations, and she said take blood pressure or administer CPR.

*** From watching the video and listening to it, it did appear that it was a large—I consider it a large room, certainly much larger than most interrogation rooms that I have seen. There was easy access and exit to the place. She was not placed in a position where she was blocked from the door. In fact, one door that I could see was left open *** which was the exit out of that room.

She was sitting across the table from the police officer, who during almost all the time that Mr. Emrich was questioning her didn't even seem to be paying attention. He was making notes, and looking at his phone and doing other things. He wasn't even looking at her. And so it wasn't some sort of a sta[re] down tactic.

I did notice that she had a bottle of water there placed in front of her, and she did seem to be pretty relaxed during the time that she was interviewed. Now, as the interview progressed, I could tell that she got tense somewhat, changed a little bit of body language, but—so I did make that note. She did seem to be very responsive to the questions. Seemed to be able to understand what was being said, and I didn't notice confusion or her being under the influence of anything or anything like that. There's nothing to indicate to me that she was having a mental health issue, um, or that she was coerced in any way. The interviewers were very low-key compared to most police interviews I have watched over

14

the years and took a kind tone.

I don't know. Invoking God's approval or disapproval, I'm not sure about that, um, but I believe that it is lawful for police officers to lie to the person that they are interrogating. And so[,] I doubt that invoking God—although it may not be in the best taste, I doubt it's illegal.

\*\*\* I don't believe that [defendant's] freedom of action was deprived in any significant way.

[Defendant] was contacted by Mr. Emrich, and according to him they consulted on when and where to have the interview. She came or—was brought by her husband, but she came of her own free will. I didn't detect anything that indicated that she was not there of her own free will. Um, I detected nothing on the part of either one of the persons interviewing her that showed that they were mean to her or threatening her in any way. She was told more than once that she was going to be leaving, going home.

Um, so, taking all of those things into consideration, the interrogation I believe was noncustodial."

Thus, the court denied defendant's motion to suppress.

¶ 33    On September 30, 2018, Attorney Drew filed a motion for substitution of attorneys. In the motion, defendant agreed to Attorney Drew withdrawing his appearance and Attorney Duane Verity entering his appearance.

¶ 34    On October 3, 2018, the trial court held a final pretrial hearing, with Attorney Verity present in the courtroom with defendant. Attorney Drew was not present. That same day, Attorney Verity filed a motion to continue defendant's jury trial. The court then heard argument on defendant's motions. Following the State's oral objection to defendant's motion for substitution

15

of attorneys, the court "believed this Motion *** should be attended by Mr. Drew, who is not here." After the State informed the court of Attorney Drew's presence in the courthouse that day, the court took a quick recess to locate him. Following the recess, Attorney Drew's associate, Attorney Brady Allen, appeared. Attorney Allen informed the court that he had no personal involvement in defendant's case. Attorney Allen stated that Attorney Drew had availability to attend a hearing tomorrow, October 4, 2018, concerning defendant's motion. As such, the court reset the hearing for the next day.

¶ 35 On October 4, 2018, the trial court held a hearing on defendant's motion for substitution of attorneys. Attorney Drew informed the court that defendant "no longer wanted [his] services, which is, [he] believe[d] her right to do." In response, the State objected to any continuances of defendant's jury trial. The court then questioned Attorney Verity as to whether he was ready, willing, and able to enter his appearance and represent defendant at trial in five days on October 9, 2018. Attorney Verity responded that he was ready to represent defendant but not ready to defend a Class X felony at trial. The court, citing *People v. Segoviano*, 189 Ill. 2d 228, 245 (2000), stated that it "must inquire into the actual request to determine whether it's being used merely as a delaying tactic." The court then listed four factors to consider to determine if defendant's request constituted a delaying tactic, including (1) whether defendant articulates an acceptable reason for desiring new counsel, (2) whether defendant has continuously been in custody, (3) whether defendant informed the court of her efforts to retain counsel, and (4) whether defendant has cooperated with current counsel. With regard to these factors, the court stated the following:

"A couple of things that I can note for the record. This matter has been pending. Mr. Drew entered his appearance on January 21, 2016, Ms. Parke, and you posted bail on February 2 of 2016, so you have not been in custody since that time. There was a TASC

16

referral made. This matter was then set for jury trial originally—a year passed. It was set in 2017. There was a *bona fide* doubt raised by your attorney as to your fitness to stand trial. You were evaluated as you may recall. The evaluator found you fit for trial. The Court found you fit with counsel having stipulated to that report. The jury trial that was originally set was vacated, then it was reset in September of '17. That, um, matter then eventually was vacated. There was a change of plea set. That did not occur. There was a Motion to Suppress hearing which took place. That was a lengthy matter. The Court then also reset the jury trial again. It was vacated again, and this was by agreement of the State, I think. Um, at any rate, now it's set again for October 9.

And it seems to me that on *** July 11 this matter was set for jury trial today and pretrial August 13. August 13 Mr. Drew appeared. The matter was set for final pretrial conference. The Court has not received any, any comments from anybody that there was another attorney in the works, that you were dissatisfied, Ms. Parke. And so that's the last this court heard was August 13 until, um, yesterday. This trial was set specifically to make accommodations. It was set during the civil week because this is a very busy county but that's fine. We can do it.

Um, so the Court—I think—first off, I don't believe the Court has any obligation to allow an attorney to withdraw certainly on the eve of trial and this is in essence on the eve of trial since it's a court holiday Monday, and we set the final pretrial as close to the trial as we could to accommodate everyone.

So, um, I think the motion to substitute is appropriate, that it be filed. I don't hold that against anybody. And um, I have no doubt that Mr. Verity knows his way around criminal court. And I would like to really know, Mr. Drew, what—I guess without

17

revealing attorney-client privilege or anything like that, I would like to know why this wasn't filed a lot sooner than it was?"

¶ 36 Attorney Drew responded that he filed the motion immediately after defendant informed him of her decision to seek new counsel. Attorney Drew stated the following:

"Ms. Parke has remained in contact with me. She has—she hasn't thwarted my representation of her or been lacking diligence in that. We have met on multiple occasions, both before motions to suppress hearings and subsequent. I[n] my opinion based on my interaction with her, I don't view this request by her as being anything more than a loss of, I guess, confidence in my abilities and a choice to go with another attorney, which I think is her prerogative to do. I understand the case has been pending for some time, but I do believe that she's not doing it solely for the purpose of delay.

Under the circumstances, it is somewhat late. Um, a little, I guess, surprising on my behalf, but, I mean, clients can lose faith in attorneys for whatever reason. And once they do, that's where she's at and seeks Mr. Verity. Under the circumstances *** from my interactions with her, I don't see—this is her first time requesting this. I don't believe it's a case—circumstances where she's just simply trying to avoid a trial in the case or avoid that. I think she wants a trial counsel of her choosing, which she has chosen at this point in time."

Attorney Drew then stated that if Attorney Verity entered representation but was unable to represent defendant at trial on October 9, 2018, he would enter a motion for a "brief continuance of a month or a month and a half." Attorney Drew clarified that the court continued defendant's trial—and he acquiesced—because the State had a murder case set for the same time. Attorney Drew continued to state: "So clearly, it wasn't necessarily the Defendant's request to continue the

18

trial the last time, although we acquiesced in it, and understand and were perfectly comfortable with moving it under the circumstances." Attorney Drew asserted that he did not believe defendant requested new counsel for "nefarious purposes or to thwart the administration of justice." Instead, he believed her request was "genuine *** to have counsel of her choosing," especially since it was the first time that she made such a request. Attorney Drew asserted that the court's denial would be highly prejudicial to defendant. Attorney Drew reiterated defendant's cooperation throughout the length of his representation.

¶ 37　Following a brief recess, the trial court asked defendant to explain her decision to change attorneys before trial. Defendant stated that she lost confidence in Attorney Drew during a final pretrial meeting. Defendant specifically stated: "After I met with [Attorney Drew], he told me his decision, and I didn't feel confident, so I seeked [*sic*] a different counselor."

¶ 38　In response, the State requested the trial court deny defendant's motion, arguing that defendant's motion to substitute attorneys served as "nothing more than a delay of the trial." The State detailed the timeline of defendant's case, stating that the trial court originally scheduled defendant's trial for January 10, 2017; however, the court allowed a continuance on January 3, 2017, "because we were told there was going to be a possible plea." When defendant did not enter into a plea deal with the State, the court set defendant's trial for June 16, 2017, which Attorney Drew confirmed on April 18, May 2, and May 31, 2017. On June 7, 2017, six days before trial, Attorney Drew raised a *bona fide* doubt as to defendant's fitness. After the court found defendant fit to stand trial, the court set defendant's trial for August 20, 2018.

¶ 39　The State also argued that the parties, by agreement, decided on July 11, 2018, to reset defendant's trial from August 20, 2018, to October 9, 2018. On August 13, 2018, both parties agreed to October 9, 2018, as defendant's trial date. The State argued:

"We have received absolutely no word from August 13 until here, the eve of trial, that, um, this was not going to be a trial. It's a 3-year-old case. I think that the administration of justice is thwarted. The State has subpoenaed all of its witnesses. We are ready to go. I think that the history would reflect that delay favors the Defendant because witnesses move, they die, they change jobs."

The State further argued that defendant's request to substitute attorneys demonstrated a repeated pattern "of we get it set and something always occurs to get it continued." The State asserted that "there has always been something that comes up that has to move her [trial]," including when defendant informed the State that she would plead guilty but ultimately chose not to on several occasions. According to the State, defendant's motion to substitute attorneys demonstrated another delay tactic.

¶ 40    In response, Attorney Drew stated that at a meeting on October 2, 2018, he and defendant disagreed on "strategy and other things that I won't delve into the details of *** but some issues as it relates to that. And I believe at that point that she had lost confidence in my ability to represent her ***." Attorney Drew argued that, although a delay would take place if the trial court granted defendant's motion, the State failed to present any evidence of prejudice. Again, Attorney Drew asserted the following:

"I don't believe based on my discussions with [defendant] that this is any attempt by her to [delay]. It is simply an attempt to retain the counsel of her choosing to [defend] her case in the matter in which she wants, and I would request of the Court to give her that opportunity."

¶ 41    The trial court then asked Attorney Verity if he would be ready to go to trial on October 9, 2018. The following colloquy took place between the court and Attorney Verity:

"MR. VERITY: In good conscience, I don't believe so, Judge. I believe I am going to stay with the ruling in *Childress* on this one. She is not only entitled to counsel of her choice[,] but she is entitled to counsel who is prepared. The notion that this, which I have just listened to, is a tactical delay flies in the face of my almost 30 years of law practice where this has never been an accusation that I have endured. I am not complicit in any delay. I am complicit in seeing to it that a defendant who is facing a Class X felony is not driven to trial by convenience.

\* \* \*

THE COURT: I don't think anybody is accusing you of anything, Mr. Verity.

MR. VERITY: It just didn't hit me right, Judge, when I heard it, and I think *Childress* just spoke to it exactly right. Thank you."

¶ 42 Following argument by the parties, the trial court denied defendant's motion for substitution of attorneys. The court reasoned that defendant's case was three years old. The court also noted that defendant posted bond following her arrest and had been out of custody since that time. In addition, the court noted that Attorney Drew, an experienced criminal lawyer, represented defendant for years, had defended a number of jury trials in his career, and had indicated that defendant had been compliant and cooperative through the length of his representation of her. The court also considered that defendant's matter "is now in its fourth jury setting. It certainly has gone much longer, I think, than normal case life, at least in this county in recent times." As such, the court stated:

"I think that any further delay would be against the need for efficient and effective administration of justice. \*\*\* I have not been satisfied with the articulation of the reason for changing counsel a few days before [the] jury trial is to take place, um, so that would

21

be the ruling of the Court."

In denying defendant's motion, the court, considering Attorney Drew's heavy investment in defendant's case, ordered Attorney Drew to continue representing defendant.

¶ 43    The trial court held defendant's jury trial on October 9 and 10, 2018. At trial, Attorney Drew did not represent defendant. Instead, Attorney Allen, a newly licensed associate of Attorney Drew not previously involved in defendant's case, represented defendant. Following the close of evidence, the jury unanimously found defendant guilty of aggravated arson.

¶ 44    On January 3, 2019, the trial court subsequently sentenced defendant to 10 years in the Illinois Department of Corrections. Defendant did not file a posttrial motion.

¶ 45    On January 14, 2019, Attorney Drew moved to withdraw as defendant's counsel. On January 25, 2019, defendant filed a *pro se* letter with the trial court pertaining to trial counsel representation.[2] Specifically, defendant stated the following:

"I am pleading to the courts for an appeal as I feel I was not represented to the best of my lawyer[']s ability. I feel your honor there was things that should have been done as I asked and paid to get done that have not been. Witnesses that should have been called upon and were not. *** I am asking you Judge Crisel to please except [*sic*] my appeal for a fair justice."

¶ 46    On February 1, 2019, while Attorney Drew's motion to withdraw as defendant's counsel was pending, Attorney Drew filed a timely notice of appeal. On appeal, this court remanded defendant's case to the trial court to conduct a preliminary *Krankel* hearing into defendant's *pro se* claims of ineffective assistance of counsel. See *People v. Parke*, No. 5-19-0051, ¶¶ 8-9 (2021)

---

[2]Defendant's *pro se* letter to the trial court failed to specify whether Attorney Drew and/or Attorney Allen rendered ineffective assistance of counsel.

22

(unpublished summary order under Illinois Supreme Court Rule 23(c)). This court issued its mandate on February 24, 2021.

¶ 47 On March 29, 2021, the trial court, with defendant appearing *pro se*, conducted a *Krankel* preliminary hearing on remand. After taking the matter under advisement, the court determined in a written order, dated April 26, 2021, that some merit existed as to defendant's allegation of ineffective assistance of counsel with regard to the failure of Attorneys Drew and Allen to file a motion for a new trial. The court appointed counsel for defendant.

¶ 48 On April 7, 2022, defendant, represented by counsel, filed motions for a new trial and to vacate the jury verdict and to reconsider sentence. Relevant to this appeal, defendant's motion for a new trial alleged that the trial court erred by denying defendant's motions to suppress statements and for substitution of attorneys. The court held a hearing on defendant's motions on September 15, 2022. After taking the matter under advisement, the court entered a written order denying both motions on October 17, 2022. Defendant filed a timely notice of appeal.

¶ 49 On June 14, 2024, after both parties filed their respective briefs, defendant filed a motion to take judicial notice of the disbarment of Attorney Allen, defendant's trial attorney, after our supreme court granted Allen's motion to have his name removed from the master roll of attorneys, pursuant to Illinois Supreme Court Rule 762(a) (eff. July 1, 2017). This court ordered the motion taken with the case, and we grant defendant's motion.

¶ 50                                            II. Analysis

¶ 51 On appeal, defendant argues that the trial court (1) committed reversible error by denying her motion to suppress her un-Mirandized responses to a custodial interrogation, (2) violated her sixth amendment right to counsel by denying her motion to substitute attorneys, and (3) imposed an excessive sentence. For the following reasons, we reverse and remand.

23

¶ 52                    A. Motion to Substitute Attorneys

¶ 53    We first address defendant's argument that the trial court violated her sixth amendment right to counsel by denying her motion to substitute attorneys. While an accused's right to counsel (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; Ill. Rev. Stat. 1985, ch. 38, ¶ 113-3) is absolute and unqualified, the right to choose counsel is limited, although fundamental. *People v. Spurlark*, 67 Ill. App. 3d 186, 196 (1978); *People v. Tucker*, 382 Ill. App. 3d 916, 920 (2008). A defendant who abuses the sixth amendment right to counsel in an attempt to delay trial and thwart the effective administration of justice may forfeit her right to counsel of choice. *Tucker*, 382 Ill. App. 3d at 920 (citing *People v. Howard*, 376 Ill. App. 3d 322, 335, (2007)). "It is within the discretion of the trial court to determine when the defendant's right to select counsel unreasonably interferes with the orderly process of judicial administration." *People v. Burrell*, 228 Ill. App. 3d 133, 142 (1992) (citing *Spurlark*, 67 Ill. App. 3d at 197). A determination of the issue turns on the particular facts of each case. *People v. Little*, 207 Ill. App. 3d 720, 724 (1990).

¶ 54    "In balancing the judicial interest of trying the case with due diligence and the defendant's constitutional right to counsel of choice, the court must inquire into the actual request to determine whether it is being used merely as a delaying tactic." *Burrell*, 228 Ill. App. 3d at 142. The factors to consider are whether defendant articulates an acceptable reason for desiring new counsel; whether the defendant has continuously been in custody; whether she has informed the trial court of her efforts to obtain counsel; whether she has cooperated with current counsel; and the length of time current counsel has represented the defendant. *Id.*; see also *People v. Childress*, 276 Ill. App. 3d 402, 411 (1995). It is well established that a trial court does not abuse its discretion by denying a motion to continue for substitution of counsel in "the absence of ready and willing substitute counsel." *People v. Segoviano*, 189 Ill. 2d 228, 245 (2000).

¶ 55    Here, the balance of the pertinent factors does not support the trial court's refusal to allow defendant to exercise her right to counsel of choice. Although defendant's case had been pending since January 2016, no evidence demonstrates that defendant sought to delay or thwart justice by filing a motion to substitute counsel. The record demonstrates that defendant had been out of custody since February 2016—a factor that weighed against her. However, defendant never previously sought to change attorneys or failed to cooperate with Attorney Drew during his almost three-year representation of her. Moreover, defendant did not fail to identify new counsel at the time that she filed her motion to substitute counsel. Instead, the record shows that Attorney Verity entered his appearance on October 3, 2018, at the same time defendant informed the court of her desire to obtain new counsel, and Attorney Verity appeared in court on October 3, 2018, ready to represent defendant.

¶ 56    Moreover, at the October 4, 2018, hearing, Attorney Verity informed the trial court that he was ready, willing, and able to represent defendant. He, however, requested time to speak to witnesses and read through the record in order to properly and in "good conscience" defend a Class X felony at trial. Despite this, the court made no inquiry into how long Attorney Verity required to prepare for trial, provided a continuance was necessary to properly represent defendant. See *People v. Jenkins*, 2020 IL App (1st) 172422, ¶ 16 ("The trial court made no inquiry into how long [counsel] required to prepare for trial ***."). Instead, Attorney Drew, not Attorney Verity, stated on the record that he would enter a motion for a "brief continuance of a month or a month and a half" if Attorney Verity entered representation but was unable to represent defendant at trial on October 9, 2018.

¶ 57    We also note that both Attorneys Drew and Verity stated multiple times on the record that they did not believe defendant's request to substitute counsel served to delay or thwart justice.

Rather, following a final pretrial meeting between Attorney Drew and defendant, defendant lost confidence in Attorney Drew's trial strategy. Consistent with this, defendant stated the following before the court: "After I met with [Attorney Drew], he told me his decision, and I didn't feel confident, so I seeked [*sic*] a different counselor. I liked what he had to offer." For attorney-client privilege reasons, neither Attorney Drew nor defendant provided further explanation. In addition, the trial court did not inquire further or ask defendant to explain the efforts she took to retain Attorney Verity. Moreover, Attorney Drew confirmed multiple times on the record that defendant had been cooperative throughout the case, stating: "[T]hat's why I feel strongly that I don't believe this is being done to subvert justice because she has been cooperative with me throughout." Despite this, the court denied defendant's motion, stating its dissatisfaction with defendant's "articulation of the reason for changing counsel."

¶ 58     Lastly, we note that the record confirms that the trial court continued defendant's jury trial multiple times. A review of the record and the parties' arguments at the hearing on defendant's motion to substitute attorneys indicates that the trial court originally scheduled defendant's trial for January 10, 2017. The court, however, granted a continuance on January 3, 2017, due to the possibility of defendant entering into a plea agreement with the State. After defendant chose not to enter into a plea deal, the court set defendant's trial for June 16, 2017; however, the court granted a continuance after Attorney Drew raised a *bona fide* doubt as to defendant's fitness on June 7, 2017. The court then set defendant's trial for August 20, 2018; however, the parties, by agreement, requested a continuance and defendant's trial was set for October 9, 2018. With these dates in mind, we are unconvinced by the court's reasoning that "the need for efficient and effective administration of justice" outweighed defendant's constitutional right to her choice of counsel.

26

¶ 59 Based on a detailed review of the factors above, we find the trial court abused its discretion by denying defendant's motions to substitute and continue her trial, where the evidence does not support a finding that defendant's actions supported delay or thwarted justice. See *People v. Sullivan*, 234 Ill. App. 3d 328, 332 (1992) ("The importance of enabling the defendant to exercise [her] right to be represented by counsel of [her] own choosing is generally deemed to outweigh the inconvenience to the prosecution, witnesses, court and jury, unless it is shown that the defendant's actions were taken for the purpose of delay."). Accordingly, for the reasons stated above, especially the court's failure to inquire into how long Attorney Verity required to prepare for trial, we find the trial court committed reversible error.

¶ 60                    B. Motion to Suppress Statements

¶ 61 We next address defendant's argument that the trial court erred by denying defendant's motion to suppress statements in a video-recorded interrogation, where Emrich's and Franklin's questions amounted to a custodial interrogation in violation of *Miranda.* Defendant argues no reasonable, innocent person in her shoes would have felt free to stop answering Emrich's and Franklin's questions during the interrogation. The question before this court is whether a custodial interrogation, requiring *Miranda*, took place. We believe one did.

¶ 62 The standard of review applicable to a ruling on a motion to suppress evidence is twofold. The trial court's factual findings and credibility determinations are upheld unless they are against the manifest weight of the evidence. *People v. Jones*, 215 Ill. 2d 261, 267-68 (2005). After the trial court's factual findings are reviewed, the court's ultimate legal rulings are reviewed *de novo. Id.* at 268. A reviewing court remains free to undertake its own assessment of the facts in relation to the issues presented and may draw its own conclusion when deciding what relief should be granted. *People v. Kveton*, 362 Ill. App. 3d 822, 830 (2005). We may consider the testimony presented at

27

trial, as well as the testimony at the suppression hearing, when reviewing the trial court's ruling on a motion to suppress. *People v. Slater*, 228 Ill. 2d 137, 149 (2008). Where a defendant challenges the admissibility of a confession through a motion to suppress, the State bears the burden of proving the voluntariness of the confession by a preponderance of the evidence. 725 ILCS 5/114-11(d) (West 2020); *People v. Braggs*, 209 Ill. 2d 492, 505 (2003).

¶ 63    In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the United States Supreme Court held that, prior to the start of an interrogation, a person being questioned by law enforcement officers must first "be warned that [she] has a right to remain silent, that any statement [she] does make may be used as evidence against [her], and that [she] has a right to the presence of an attorney, either retained or appointed," as long as that person has been "taken into custody or otherwise deprived of [her] freedom of action in any significant way." The finding of custody is essential, as the pre-interrogation warnings required by *Miranda* are intended to assure that any inculpatory statement made by a defendant is not simply the product of " 'the compulsion inherent in custodial surroundings.' " *Yarborough v. Alvarado*, 541 U.S. 652, 661 (2004) (quoting *Miranda*, 384 U.S. at 458).

¶ 64    The determination of whether a defendant is "in custody," and, therefore, whether the warnings set forth in *Miranda* are required, involves " '[t]wo discrete inquiries,' " including: " 'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' " *Braggs*, 209 Ill. 2d at 505-06 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). When examining the circumstances of interrogation, our supreme court found a number of factors relevant in determining whether a defendant made a statement in a custodial setting, including: "(1) the location, time, length, mood, and mode of questioning; (2) the number

of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused." *Slater*, 228 Ill. 2d at 150 (citing *Braggs*, 209 Ill. 2d at 506; *People v. Melock*, 149 Ill. 2d 423, 440 (1992)). "After examining and weighing these various factors, we must then make an objective determination as to whether, under the facts presented, 'a reasonable person, innocent of any crime' would have believed that *** she could terminate the encounter and was free to leave." *Id.* (citing *Braggs*, 209 Ill. 2d at 506; *People v. Fair*, 159 Ill. 2d 51, 66-67 (1994)).

¶ 65    After considering the relevant factors and the circumstances of this case, we find that defendant was subjected to a custodial interrogation, requiring *Miranda*, when defendant confessed to starting the fire at the Drury Inn on December 2, 2015. As stated, one factor to consider in making a custody determination is the manner by which the individual arrived at the place of questioning. It is undisputed that defendant and Jeremy drove to the Mt. Vernon Fire Department. Jeremy then waited to take defendant home following the interrogation. We recognize that defendant's voluntary arrival at the fire department by means of her own transportation is distinguishable from a situation in which a defendant is transported to and from the place of the interrogation by law enforcement officers. See *Braggs*, 209 Ill. 2d at 511-14 (court determined defendant "in custody" for *Miranda* purposes where officers transported her to and from interrogation). As such, this factor does not weigh in favor of a finding of a custodial interrogation.

¶ 66    Next, we look to the location, time, length, mood, and mode of questioning. We first note that the trial court did not reference the time and length of the interrogation in its reasoning. In finding that defendant was not subjected to a custodial interrogation, the trial court reasoned that

29

the interrogation took place in a large room, with an open door, and that neither officer blocked defendant from the door. The recorded video demonstrates an open door but also a closed door, a fact that the court failed to state. In fact, the door closest to defendant's seat was closed. In addition, the video does not demonstrate a large room but a room that required defendant to sit relatively close to Emrich and Franklin. As such, we find the court's factual finding against the manifest weight of the evidence.

¶ 67    As to the mood and mode of questioning, the recorded video reveals that Emrich initially handed defendant a bottle of water and informed her that he planned to conduct an "information gathering" interview. Defendant also testified consistently with this statement. As the recorded video progressed, however, both Emrich and Franklin pronounced their suspicions to defendant with respect to defendant's culpability. As a result, the video reveals that defendant became more tense and changed her body language, as the trial court correctly noted. The video shows that Emrich stated at least 10 times that he did not believe defendant's version of events and accused her of lying and withholding the truth. Similarly, Franklin interjected halfway through the interview, informing defendant that he was trained to listen to people talk. Franklin then proceeded to state to defendant at least two times that she was not telling the truth. Franklin also claimed that he and Emrich knew that defendant "intentionally" started the fire in room 603. The trial court made no mention of these facts when it denied defendant's motion to suppress. Instead, the court determined that Franklin did not seem to pay attention "during almost all the time" that Emrich questioned defendant. Thus, according to the court, Franklin did not employ a "sta[re] down tactic."

¶ 68    Moreover, the trial court determined that Emrich and Franklin did not coerce defendant "in any way." Rather, Emrich and Franklin were "low-key compared to most police interviews [the

30

court had] watched over the years and took a kind tone." Although we agree with the court that neither Emrich nor Franklin were unkind or threatened defendant, defendant found herself in a room in the presence of two larger men, including Franklin, a police officer, who defendant never agreed to meet with and failed to introduce himself to defendant at the outset of the interrogation. Importantly, the court failed to make a factual finding that the officers verbally conveyed their belief to defendant that she was guilty and how this knowledge by defendant would affect a reasonable person in defendant's position with respect to her perception that she was free to leave. See *Stansbury v. California*, 511 U.S. 318, 325 (1994) (The U.S. Supreme Court reasoned that if an officer's beliefs of a person's guilt "are conveyed, by word or deed, to the individual being questioned," such beliefs "may bear upon the custody issue." The Court further stated that such disclosed beliefs "are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.' "). In our view, the mood and mode of questioning employed by Emrich and Franklin weighs in favor of a finding of a custodial interrogation.

¶ 69     Next, we look at the number of police officers present and the presence or absence of family and friends of the individual. We note that the trial court did not resolve the inconsistency between the testimony of Emrich and defendant at the hearing on defendant's suppression motion. For instance, Emrich testified that he and Franklin escorted defendant upstairs to the interrogation room after defendant and Jeremy arrived at the fire department. Defendant, however, testified that she encountered Franklin, a police officer wearing a badge with his gun holstered, when she first walked into the room. According to defendant, she saw Franklin for the first time "sitting out behind his desk *** with his legs propped up on the desk." Regardless, neither Emrich nor defendant testified that defendant knew Franklin would be present when she agreed to speak with

31

Emrich at the fire department. Defendant, instead, agreed to speak with Emrich in the presence of her husband. Importantly, defendant testified at the suppression hearing that she specifically asked Emrich on the phone—at the time she agreed to meet with Emrich—to have her husband present during the interview, stating: "I can't talk—I don't understand a lot of things and he helps me." Despite this, Emrich offered Jeremy a seat downstairs, indicating that Jeremy was not welcome in the interview. As such, the absence of defendant's husband and the presence of Franklin during the interview weigh in favor of a determination that a custodial interrogation took place.

¶ 70    We also note that there were no indicia of formal arrest procedures during defendant's questioning at the fire department. The record is devoid of any use of a show of force, physical restraint, booking, or fingerprinting. Despite this, throughout defendant's time at the fire department, Emrich wore a uniform, and Franklin carried a holstered weapon. Moreover, approximately 25 minutes into the interview, Franklin interjected and stated that he heard "major inconsistencies" with defendant's story. Shortly after this, defendant confirmed, by nodding her head in acknowledgement, that she was scared to hear that Franklin was a police officer when the interview started. We also note that both officers told defendant, on multiple occasions, that she would go home that day. They, however, did not advise her that she was free to leave during the interview, and defendant did not request to leave. In our view, this factor is neutral in determining whether a custodial interrogation took place.

¶ 71    Lastly, this court also looks to the age, intelligence, and mental makeup of the accused. In reviewing the trial court's reasoning to deny defendant's motion to suppress, the court believed that defendant's lack of a high school education—similar to the judge's father's eighth grade education—did not have "any bearing on a person's intelligence or ability to understand things." For support, the court stated that defendant, a first responder, had "the intellectual ability to assess

medical situations, and she said take blood pressure or administer CPR." We cannot agree. The record reflects that defendant, a woman in her late 30s, took special education classes before she dropped out of high school. Defendant failed the GED test once and never retook the exam. Defendant had no criminal history and no known contact with the criminal justice system. Defendant underwent a fitness evaluation prior to trial, and Dr. Stanislaus concluded that defendant had borderline intellectual functioning. In her report, Dr. Stanislaus's indicated that defendant's "younger sister helps her with things if she cannot understand something." Moreover, defendant testified that she asked Emrich to have Jeremy with her during the interview, stating: "I can't talk—I don't understand a lot of things and he helps me." Furthermore, defendant testified that "once [people] start talking to me, I get confused and say whatever they want to hear to get them off my back or whatever." Based on the above reasoning, in our view, defendant's intelligence and mental makeup weigh in favor of a finding of custodial interrogation.

¶ 72      Our review of the above factors leads to the conclusion that, based upon the circumstances presented, a reasonable innocent person in defendant's position would not have felt free to terminate her encounter and leave the fire department. Accordingly, we conclude that defendant was subjected to a custodial interrogation, requiring *Miranda* warnings. Because it is undisputed that no such warnings were given, the circuit court erred by denying defendant's motion to suppress.

¶ 73      Moreover, the improper admission of a defendant's statements to police is subject to a harmless-error analysis. *People v. Mitchell*, 152 Ill. 2d 274, 328 (1992). Under a harmless-error analysis, the critical question is whether it appears beyond a reasonable doubt that the error did not contribute to the verdict. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). There are three different approaches to answering this critical question: (1) analyzing the other evidence from the case to

determine if that evidence overwhelmingly supported the defendant's conviction, (2) focusing on whether the error contributed to the verdict, and (3) determining whether the properly admitted evidence is merely cumulative to the other evidence properly admitted at trial. *Id.*

¶ 74    With these principles in mind, we cannot conclude beyond a reasonable doubt that the jury would have convicted defendant without her confession. A jury might have doubted defendant's testimony concerning her key card usage that showed atypical housekeeping behavior, as the State points out. However, without defendant's confession, we are unconvinced that overwhelming evidence existed to convict defendant beyond a reasonable doubt of aggravated arson. We find support in the fact that Emrich testified at defendant's jury trial that he relied "entirely upon [defendant's] confession" in deciding that she started the fire. As such, defendant's confession contributed to her conviction. Moreover, the record demonstrates that the custodial interrogation was not cumulative to other evidence properly admitted at trial. Based on the above, we simply cannot conclude that the admission into evidence of defendant's confession made no difference to the result.

¶ 75    Due to our disposition of the above issues, we need not address defendant's remaining contention regarding her sentence on appeal. We note that we considered all of the evidence presented at trial with regard to defendant's conviction that we are reversing and find it sufficient to support that conviction; accordingly, double jeopardy does not prevent the retrial of the defendant. See, *e.g.*, *People v. Jamison*, 2014 IL App (5th) 130150, ¶ 18 (if evidence was sufficient to convict the defendant, principles of double jeopardy do not preclude retrial). We reach this conclusion because when we consider whether double jeopardy bars a retrial, the relevant question before us is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable

doubt. See, *e.g.*, *People v. Lopez*, 229 Ill. 2d. 322, 367 (2008). We set out the evidence against the defendant in this case in extensive detail above. We conclude that from this evidence, a rational jury could have found beyond a reasonable doubt the essential elements of aggravated arson.

¶ 76                                    III. Conclusion

¶ 77    For the reasons stated, defendant's conviction and sentence are reversed, and this cause is remanded for a new trial with defendant's counsel of choice, without defendant's confession, and for further proceedings consistent with this decision.

¶ 78    Judgment reversed; cause remanded.